**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

**LOUISIANA MINERALS LTD**   **CIVIL ACTION NO. 22-145**

**VERSUS**   **JUDGE EDWARDS**

**WEYERHAEUSER CO**   **MAGISTRATE JUDGE HORNSBY**

## OPINION

Before the Court is a contract dispute between Louisiana Minerals, Ltd. ("LML") and Weyerhaeuser Company ("Weyerhaeuser") concerning the interpretation and enforcement of a series of 99-year Timber Sale and Lease Contracts executed in 1986. LML alleges that Weyerhaeuser breached the parties' agreement by entering into third-party agreements and charging excessive damages for loss of timber and use of the surface, thereby interfering with LML's mineral development and exceeding the contractual compensation scheme. LML seeks damages for breach of contract, declaratory judgment, and attorneys' fees.

Following a five-day bench trial, and having considered the testimony, evidence, and arguments of counsel, the Court issues the following Findings of Fact and Conclusions of Law. To the extent any finding of fact constitutes a conclusion of law, it shall be deemed so, and vice versa.

## FINDINGS OF FACT

Based on the evidence and arguments presented, the Court makes the following findings of fact:

## I.    The Parties

1.    LML owns, and leases to Weyerhaeuser, approximately 200,000 acres of land in north Louisiana within Bienville, Claiborne, DeSoto, Grant, Jackson, Lincoln, Natchitoches, Sabine, and Union Parishes (the "Property").[1]

2.    Weyerhaeuser owns approximately 1,000,000 acres of land in north Louisiana and Arkansas in fee simple, many of which are in the same parishes and sections/townships/ranges as the Property. Weyerhaeuser conducts large-scale timber operations both on its leased land (the Property) and its fee lands.[2]

3.    On September 18, 1986, the parties' predecessors in interest executed the Timber Sale and Lease Contracts now at the center of this dispute (collectively, the "Timber Contract"), which accomplished the sale of timber and a 99-year lease of the Property.[3]

4.    LML acquired ownership of the Property in 1989, becoming the successor-in-interest to the Grantor under the Timber Contract.[4] Separately, LML acquired ownership of the minerals in the Property, subject to the rights and obligations imposed by the Timber Contract.[5]

5.    Weyerhaeuser acquired the Grantee's interest in the Property in 2002, as a result of a merger with Willamette Timber Company, Inc. ("Willamette").[6]

---

[1] PX 1; PX 3-11; Testimony of Phillip Blower ("Mr. Blower"), Weyerhaeuser's corporate representative at trial and its Director of Oil and Gas in its Energy and Natural Resources Division.
[2] Testimony of Mr. Blower.
[3] PX 3-11.
[4] PX 1.
[5] PX 2.
[6] PX 107; Testimony of Mr. Blower.

## II.    The Timber Contract

6.    The 99-year Timber Contract remains in effect through 2085.[7]

7.    One of the primary purposes of the Timber Contract is to permit Weyerhaeuser to conduct its timber operations.[8] However, Article 5 of the Timber Contract also provides that Weyerhaeuser is not limited to "the growing, cutting and removing of timber, trees, wood and other forest products on the said land, but is hereby given the ***specific right to use the lands for any purpose it desires***, including farming, grazing and ***subleasing***, which right carries with it the ***full power and authority to do any and all things necessary, essential and incidental to*** any use thereof, specifically excepting, however, any right to use said land for the exploration for or production of minerals of any kind."[9]

8.    In Article 6, LML reserves "all rights ***necessary or desirable*** (including the right to make and grant to others any and all leases, mineral and royalty conveyances and contracts of any kind) for the ownership, use, enjoyment, disposition, exploitation or development of any and all of the oil, gas, sulphur, and other minerals and substances now or hereafter susceptible of commercial exploitation ***from the above-described lands or lands pooled or unitized therewith, or lands included within the same mining plan or mining unit as said lands … together with the right to enter upon said lands***

---

[7] PX 3 at 1.
[8] PX 3 at 2, ¶ 1.
[9] PX 3 at 5, ¶ 5 (emphasis added).

*and conduct operations for the exploration for and production of any such mineral or substance*, including all forms of drilling, shaft mining, surface mining or situ combustion, *together with the right to store, save, own, remove, transport, claim, treat, process, sell or otherwise utilize minerals or substances produced, including without limitation the right to use and disturb so much of the surface and subsurface of the lands affected hereby as [LML] may find necessary, useful or convenient in carrying out preparations for the exploration for or production of the minerals or other substances* hereinabove mentioned."[10]

9.  Under Article 7 of the Timber Contract, in exercising these reserved mineral rights, LML is obligated:

(A)  To conduct its operations so as not unreasonably to interfere with [Weyerhaeuser]'s use of the property and [Weyerhaeuser]'s forest operations;

\* \* \*

(C)  To give thirty (30) days' notice or such notice as is hereinafter specified prior to conducting any operations on the property which will necessitate the cutting of timber or forest growth . . .

\* \* \*

(F)  To pay for all damage to [Weyerhaeuser]'s timber, pulpwood, sawlogs, trees, forest growth (standing, cut or fallen), or to other property of any kind caused by or arising out of [LML]'s operations;

\* \* \*

(H)  To fill slush pits and other excavations immediately after operations are completed and to restore, as nearly as possible, the surface to its original condition. If [LML] fails to do so, [Weyerhaeuser] may restore the surface and fill excavations at [LML]'s expense

\* \* \*

(L)  To pay  [Weyerhaeuser] the fair market value of timber

---

[10] PX 3 at 5-6, ¶ 5 (emphasis added).

damaged or taken, plus $60 per acre for surface acres used in any manner relating to drilling or subsurface exploration if the surface is utilized for a period shorter or less than one (1) year; if the time the surface is used or utilized by [Weyerhaeuser] exceeds one (1) year, then to pay an additional $60 for each year or part thereof for each surface acre utilized for any purpose in connection with the drilling or exploration for subsurface minerals[.][11]

10. The per acre sum owed to Weyerhaeuser pursuant to subparagraph (L) is to "be increased or decreased in proportion to change in the U.S. Consumer Price Index …" ("CPI").[12]

11. The Timber Contract also affords Weyerhaeuser "the right to assign or sublease its rights hereunder, in whole or in part, to any other party, provided that no such assignment or sublease shall relieve [Weyerhaeuser] of its obligations under this Contract or diminish those obligations."[13]

12. The Timber Contract provides that "[i]f either party institutes any suit or action to enforce any covenant or agreement hereof, the prevailing party shall be entitled to recover such sum of money as the court may adjudge reasonable as attorney fees in such suit or action, including any appeal taken by either party in such suit or action."[14]

## III.   Conduct of the Parties

13. Since the inception of the Timber Contract, third parties seeking access to the surface of the Property have consulted both the Grantor and the Grantee. In

---

[11] PX 3 at 6-7, ¶ 7.
[12] PX 3 at 7, ¶ 7.
[13] PX 3 at 10, ¶ 18.
[14] PX 3 at 13, ¶ 31.

1986 and 1987, shortly after the Timber Contract came into effect, the Grantee (Willamette) entered into third-party agreements (grants of right of way) with respect to the Property.[15] In the years following LML's acquisition of the Grantor's interest in the Property in 1989, Willamette continued the practice of entering into agreements with third parties (*e.g.*, a surface use agreement and release of damages).[16] After the 2002 merger, Weyerhaeuser continued the practice of entering into similar third-party agreements which LML now contends are unauthorized under the Timber Contract.[17]

14. In 1995, at Willamette's request, LML added a provision to its standard oil and gas lease form that required the oil and gas lessee to "pay Willamette the sum of $2,000 per acre for property used by the Lessee for roads, rights-of-way, pits, well sites or any other purpose."[18]

15. In the late 1990s, Kelly Hall ("Ms. Hall") became responsible for LML's day-to-day management of the Property's portfolio, including negotiation of oil and gas leases on LML's behalf, although all final decisions went through either B.P. Huddleston or Peter Huddleston.[19]

16. In 2000, at request of Willamette, LML changed its standard oil and gas lease form to require that the oil and gas lessee "pay Willamette the sum of $2,500 per acre for property used by the Lessee for roads, rights-of-way, pits, well sites

---

[15] DX 201; DX 481.
[16] DX 202.
[17] PX 107 (the "McGinty Spreadsheet").
[18] DX 198 at 2; DX 509; DX 510; DX 579; DX 587; DX 647; DX 648.
[19] Testimony of Ms. Hall.

or any other purpose."[20] When Weyerhaeuser acquired Willamette, LML changed the form to refer to Weyerhaeuser but retained the provision requiring payment of $2,500 per acre.[21] LML routinely revised its standard oil and gas lease form up until June 1, 2011, continually retaining the provision requiring payment of $2,500 per acre to Weyerhaeuser.[22]

17.    In 2007, Ms. Hall sent an email to a third-party noting that Weyerhaeuser "always required a right-of-way in addition to damages on the acreage under the 99 year Timber [Contract]" and that this was Weyerhaeuser's "way of replacing lost future revenues on the acreage delegated to the right-of-way."[23]

18.    In August of 2011, Ms. Hall offered to update the standard oil and gas lease form to state a $3,500 per acre amount for loss of use based on Weyerhaeuser's explanation, via its employee Don Cooper ("Mr. Cooper"),  of its per acre charges, timber valuation, and appraisal fees.[24] In the same email exchange, Mr. Cooper stated that Weyerhaeuser did not delineate between fee land and leased land but charged the same per acre regardless of the type of property interest Weyerhaeuser held.[25] At trial Weyerhaeuser's corporate representative, Phillip Blower ("Mr. Blower"), explained that Weyerhaeuser

---

[20] DX 198 at 43; DX 514; DX 555; DX 559; DX 560; DX 565; DX 574; DX 575; DX 577; DX 585; DX 588; DX 610; DX 614; DX 620; DX 621; DX 656; DX 657; DX 659; DX 662; DX 664; DX 665; DX 667; DX 668; DX 669; DX 675; DX 683; DX 686; DX 725; DX 726.
[21] Testimony of Ms. Hall.
[22] *See e.g.*, DX 693 (6/1/2003 Revision); DX 676 (11/1/2003 Revision); DX 623 (1/1/2004 Revision); DX 684 (4/1/2006 Revision); DX 666 (8/1/2006 Revision); DX 685 (1/1/2008 Revision); DX 525 (2/1/2008 Revision); DX 651 (1/1/2011 Revision); DX 569 (6/1/2011 Revision).
[23] DX 7 at 2.
[24] DX 11A at 2.
[25] DX 11A at 2.

expects similar values from both types of property because there are similar impacts on the land regardless of the dirt ownership.[26]

19.   A file was introduced at trial containing a September 5, 2012 note written by Ms. Hall, stating that a third-party operator had complained that their oil and gas lease with LML stipulated a per acre amount of $2,500 but Weyerhaeuser was instead charging them $200 per rod for a right of way.[27] Ms. Hall made note that Mr. Cooper had informed her that "they have charged this for years."[28] Ms. Hall requested that Weyerhaeuser review Article VIII(f) of the oil and gas lease form addressing damage cost which she described as "language pertinent to the Timber [Contract]."[29] Ms. Hall noted in the file that she would remove the specific price amount from the standard oil and gas lease form until she received a response from Weyerhaeuser in order to avoid confusing LML's mineral lessees.[30] Ms. Hall testified that she did not recall ever receiving a response from Weyerhaeuser regarding a new amount to state in the forms.

20.   LML revised its standard oil and gas lease form again in 2013, still requiring the lessee "to pay Weyerhaeuser for property used by the Lessee for roads, rights-of-way, pits, well sites or any other purpose" but without specifying a specific dollar amount.[31]

21.   In 2014, Mr. Cooper sent an email to Ms. Hall asking her to reach out to the

---

[26] *See also* DX 11A at 2 (Mr. Cooper explaining impacts of acreage removed from timber production).
[27] DX 198 at 3.
[28] DX 198 at 3.
[29] DX 12 at 2.
[30] DX 198 at 3; Testimony of Ms. Hall.
[31] *See e.g.*, DX 526; DX 551; DX 556; DX 571; DX 597; DX 632; DX 715; DX 731.

third party regarding the amount the third party offered being "woefully shy of [Weyerhaeuser's] normal assessments."[32] Mr. Cooper also thanked LML for removing surface value amounts from its future mineral lease agreements which "assured Weyerhaeuser the ability to stay current with market conditions and to seek equitable settlements."[33] Ms. Hall replied noting her concern that Weyerhaeuser was charging "such exorbitant prices for drill sites and ROW locations" and "that these prices will eventually hamper the development of [LML's] properties."[34]

22.    LML continued using a standard oil and gas lease form requiring payment to Weyerhaeuser, without specifying an amount, as recently as October 27, 2016.[35]

23.    From the time that LML succeeded to the Grantor's rights in the Property until shortly before LML filed this litigation, LML directed and encouraged its mineral lessees to compensate Weyerhaeuser (or before 2002, Willamette) directly for use of "roads, rights of way, pits, well sites or any other purpose."[36] LML routinely advised its mineral lessees that they would have to deal with Weyerhaeuser (or before 2002, Willamette) before going on the Property.[37] Ms. Hall testified that she had advised LML's mineral lessees to contact Weyerhaeuser out of courtesy to Weyerhaeuser as tenant and for the lessees to directly coordinate access to the Property.

---

[32] DX 181 at 1.
[33] DX 181 at 1.
[34] DX 181 at 1.
[35] DX 200.
[36] *E.g.*, DX 500; DX 550; DX 579; DX 587; DX 592; DX 595; DX 642; DX 725.
[37] DX 5; DX 170; DX 509; DX 510; DX 516; DX 579; DX 587; DX 592; DX 595.

24. From the evidence presented and testimony given at trial, Ms. Hall's understanding was that the $2,000 and $2,500 amounts included in LML's standard oil and gas lease forms were calculated by Weyerhaeuser using the Timber Contract's compensation scheme providing for $60 per acre adjusted for inflation. Even when Ms. Hall noted that the damages Weyerhaeuser was requiring seemed to be excessive, she sought to include the new adjusted amount that Weyerhaeuser was charging in the leases and asked Weyerhaeuser to review the mineral lease provision requiring payment in light of the Timber Contract. The testimony revealed that Ms. Hall trusted that Weyerhaeuser was adhering to Article 7's compensation scheme even when the amounts charged appeared to be expensive.

25. In its third-party agreements, Weyerhaeuser had purported to receive amounts for land/loss of use damages, timber damages, and administrative fees.[38] However, Weyerhaeuser did not consult the Timber Contract in determining the amount it charged LML's mineral lessees for "surface access and damages." Ms. Nanette Singleton, who negotiated third-party agreements for Weyerhaeuser, testified that she anchored prices on how much the operator "stood to make" off of using the land, not the Timber Contract.

26. Weyerhaeuser also obtained payments from third parties for surface use through the year 2085.[39] Mr. Blower testified that the fees charged in excess of the $60 per acre amount could reflect Weyerhaeuser's practice of requiring a

---

[38] PX 18;

[39] PX 18; PX 119; PX 24; Testimony of Mr. Phillip Blower and Ms. Singleton.

single lump sum payment accounting for loss of use through the year 2085. Although Weyerhaeuser's third-party agreements were publicly recorded, several witnesses testified that the commercial terms of these agreements are not included in the public record.[40]

27.  It was not until 2017, when the long-time ownership and management at LML changed and Greg Floyd ("Mr. Floyd") became LML's president, that LML discovered Weyerhaeuser was charging amounts in excess of Article 7's compensation scheme.[41] In 2019, Roger Worrell ("Mr. Worrell") began working with LML and took over negotiation and execution of contracts from Ms. Hall. He reviewed the Timber Contract and asked Ms. Hall how payments under Article 7 were handled. Ms. Hall informed Mr. Worrell that third parties dealt directly with Weyerhaeuser. Initially, Mr. Worrell did not think this arrangement raised any issues. However, in 2020, as LML aimed to enter a third-party pipeline deal, he discovered Weyerhaeuser was charging more than the $60 per acre amount and brought the issue to Mr. Floyd's attention.[42]

28.  Thereafter, LML began revising its standard oil and gas lease form to:

a.  Direct mineral lessees to pay LML for surface use instead of paying Weyerhaeuser directly;[43]

---

[40] Testimony of Joe McGinty.
[41] Testimony of Mr. Floyd.
[42] Testimony of Mr. Worrell.
[43] DX 18.

b. Require that mineral lessees notify LML of any payments made to Weyerhaeuser for timber damage;[44]

c. Remove the provision requiring lessees to indemnify Weyerhaeuser;[45] and

d. Make the oil and gas lease terminable should the mineral lessee enter into a separate agreement for surface use of the Property related to LML's reserved mineral rights with a third party, such as Weyerhaeuser.[46]

29. Around the same time, third parties began objecting to Weyerhaeuser's payment and agreement requirements when seeking access to the Property for mineral related activities.[47] Ultimately, Weyerhaeuser acquiesced to third parties who refused to meet its monetary demands or agreement requirements and the mineral lessees moved forward with their activities.[48]

30. In 2021, Mr. Blower offered the option of LML's mineral lessees executing an "entry license" as an assurance of payment and indemnification to Weyerhaeuser, removing language that purported to grant a servitude or

---

[44] DX 19.

[45] DX 19.

[46] DX 19.

[47] PX 18 (2017 email); PX 119 (2019 email);  PX 20 (2017 email from a third-party operator stating that it would pay damages to Weyerhaeuser in accordance with the Timber Contract); PX 22 (2018 email); PX 24 (2018 email); PX 39 (2021 email); PX 58 (Weyerhaeuser internal email stating that a third-party was taking issue with paying Weyerhaeuser for damages on LML leased lands and that the third party was making the point that Weyerhaeuser should see less money given that they don't own the property outright).

[48] Testimony of Ms. Singleton; *see e.g.*, PX 22 at 2; PX 40; PX 56 (In 2019, Ms. Singleton adjusted a damages calculation for that third party operator's pipeline request using a per acre figure "more in line with what … the [per acre cost] would be according to the [Timber Contract].").

easement and explicitly stating that the license is not to be recorded.[49] Mr. Blower also stated that Weyerhaeuser was fine with using the formula derived from the Timber Contract for damage payments but requested that third parties make such payments in a lump sum rather than annually.[50]

## IV.    Custom and Usages

31.    Within the oil and gas industry, the construction and operation of a pipeline to transport minerals across leased land is not generally considered a mineral related activity. That is, it is not considered to be the "exploration for or production of" minerals from the leased land.[51]

32.    A mineral related activity is the drilling of a well to extract mineral resources. A pipeline has to be connected to a well on the property to be a mineral related activity on the property.[52]

33.    A typical mineral lease does not authorize the construction of pipelines, except for lines that exclusively transport minerals produced from the leased premises and land unitized therewith.[53]

---

[49] DX 156A.
[50] DX 156A.
[51] DX 60.
[52] Testimony of Pat Ottinger.
[53] DX 60.

## CONCLUSIONS OF LAW

I.    **Breach of Contract**

A. **Legal Standard**

1.    The essential elements of a breach of contract action, which LML must prove by a preponderance of evidence, are: (1) the existence of a contract, (2) that Weyerhaeuser breached the contract, (3) and that LML suffered damages because of the breaches by Weyerhaeuser.[54]

2.    A lease contract forms the law between the parties, defining their respective legal rights and obligations.[55] Louisiana courts have consistently recognized that traditional principles of contractual interpretation apply to contracts involving mineral rights.[56]

3.    In contract disputes governed by Louisiana law, courts must seek the meaning of a written contract within the four corners and cannot rely on parol evidence to explain or contradict the language.[57] The words in a contract are to be given their generally prevailing meaning unless they are words of art or have acquired a technical meaning.[58] Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning

---

[54] *See 1100 South Jefferson Davis Parkway, LLC v. Williams*, 14-1326 (La. App. 4 Cir. 5/20/15), 165 So.3d 1211, 1216.

[55] *Carriere v. Bank of Louisiana*, 95-3058 (La. 12/13/96), 702 So.2d 648, 666; *Louisiana Mach. Co., LLC v. Bihm Equip. Co.*, 19-1081 (La. App. 1 Cir. 8/10/21), 329 So.3d 317, 321.

[56] *Stephenson v. Petrohawk Properties, L.P.*, 45,296 (La. App. 2 Cir. 6/2/10), 37 So.3d 1145, 1148.

[57] *See Village Shopping Center Partnership v. Kimble Development, LLC*, 18-740 (La. App. 5 Cir. 4/29/19), 271 So.3d 376, 382.

[58] *Hoover Tree Farm, L.L.C. v. Goodrich Petroleum Co., L.L.C.*, 46,153 (La. App. 2 Cir. 3/23/11), 63 So.3d 159, 168 (citing La. Civ. Code art. 2047).

suggested by the contract as a whole.[59] A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective.[60] Similarly, contractual provisions should not be interpreted in a way that causes language to be superfluous.[61] "Although a contract is worded in general terms, it must be interpreted to cover only those things it appears the parties intended to include."[62]

4.  "When the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed … parol evidence is admissible to clarify the ambiguity or show the intention of the parties …."[63] "A doubtful provision must be interpreted in light of the … conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties."[64] "When a contract provision relating to mineral rights is ambiguous on a pivotal issue, the Louisiana Supreme Court and Courts of Appeal have interpreted the provision as having the meaning that best conforms to the object of the contract in light

---

[59] La. Civ. Code art. 2050.

[60] La. Civ. Code art. 2049.

[61] *See* La. Civ. Code arts. 2049 and 2050; *Metro Riverboat Assocs., Inc. v. Bally's Louisiana, Inc.*, 97-1672 (La. App. 4 Cir. 01/14/98), 706 So.2d 553, 557–58; *John Bailey Contractor, Inc. v. State*, 439 So.2d 1055, 1058 (La. 1983) ("The Civil Code mandates that all clauses or parts of contracts be interpreted 'one by the other, giving to each the sense that results from the entire act.'… the courts have long held that, A cardinal rule in the construction of contracts is that the contract must be viewed as a whole and, if possible, practical effect given to all its parts, according to each the sense that results from the entire agreement so as to avoid neutralizing or ignoring any of them or treating them as surplusage.").

[62] La. Civ. Code Ann. art. 2051.

[63] *IP Timberlands Operating Co., Ltd. v. Denmiss Corp.*, 93-1637 (La. App. 1 Cir. 5/23/95), 657 So.2d 282, 294.

[64] La. Civ. Code. art. 2053.

of the nature of the contract, equity, and usages, including extrinsic evidence as to custom and practices in the oil and gas industry."[65] "Equity, as intended in the preceding articles, is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another. Usage, as intended in the preceding articles, is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation."[66]

**B. Interpretation of the Timber Contract**

**(i) "Mineral-Related" Agreements**

5.  Under the Timber Contract, LML has the exclusive and sole right to grant mineral leases and other contracts related to the exploration for and production of minerals or other substances in and under the Property.[67] The Timber Contract does not grant Weyerhaeuser the right to explore and develop the Property for production of minerals and reduce them to possession and ownership.[68] Because Weyerhaeuser can grant no rights greater than what it possesses, <u>Weyerhaeuser does not have the right to authorize or purport to grant access to third parties exploring for or producing minerals on the Property</u>.[69]

6.  However, LML's right to explore for and produce minerals <u>does not</u> prohibit

---

[65] *J. Fleet Oil & Gas Corp., L.L.C. v. Chesapeake Louisiana, L.P.*, 15-2461, 2018 WL 1463529, at *3 (W.D. La. Mar. 22, 2018); *see also* La. Civ. Code art. 2053.
[66] La. Civ. Code art. 2055.
[67] PX 3 at 5, ¶ 6.
[68] PX 3 at 5, ¶¶ 5-6.
[69] *See IP Timberlands*, 657 So.2d at 298.

Weyerhaeuser, from entering into agreements with third parties <u>concerning the damage payments.</u>

7.    The third-party agreements entered into by Willamette near the beginning of the Timber Contract's term, when Willamette merged with the 1986 Grantees, demonstrate the parties' intent that the lessee had authority to enter into such third-party agreements.[70]

8.    The parties' decades-long course of dealing also confirms that Weyerhaeuser is entitled to enter into agreements with third parties with respect to damages to the surface caused by mineral operations.[71] As early as the 1990s, LML was aware that Weyerhaeuser was entering into separate agreements with LML's mineral lessees and LML did not prevent Weyerhaeuser from seeking damage payment assurances or releases from its lessees.

9.    An interpretation of the Timber Contract that permits Weyerhaeuser to enter into agreements with respect to damages to its property interest best conforms to the nature of the contract and is more equitable than an interpretation that would prohibit or limit such agreements.

10.   Weyerhaeuser is entitled to be compensated for damage to its rights in the Property subject to the Timber Contract, and to obtain that compensation by

---

[70] *Cf. Total Minatome Corp.*, 766 So.2d at 694 (considering conduct of predecessors-in-interest "since the confection of the agreement" to resolve ambiguity).

[71] *See WH Holdings, L.L.C. v. Ace Am. Ins. Co.*, 574 F. App'x 383, 386 (5th Cir. 2014) (considering "past conduct and course of dealing of the parties and their predecessors" (emphasis added)); *Total Minatome Corp.*, 766 So.2d at 689 ("One of the best ways to determine what the parties intended in a contract is to examine the method in which the contract is performed, particularly if performance has been consistent for a period of many years."); *Arco Oil & Gas Co. v. Union Tex. Prods. Corp.*, 610 So.2d 248, 251 (La. Ct. App. 1992) ("Of particular assistance in determining intent is an observation of the manner and consistency in which the contract was performed over a period of years.").

entering into agreements with third parties that cause such damage by their activities on property leased by Weyerhaeuser.

11. Under the Timber Contract, Weyerhaeuser's entitlement to compensation relative to the exercise or use of LML's rights is expressly detailed in Article 7.[72]

12. Pursuant to Article 7, Weyerhaeuser is entitled to damages for loss of use of the surface in an amount of $60 per acre, increased or decreased in proportion to change in the CPI.[73] As early as 2002 until 2018, Weyerhaeuser, charged third parties more than $60 per acre adjusted for inflation for "surface access and damages" in contravention of the Timber Contract.

13. Weyerhaeuser cannot negotiate any amount for the right to access the Property with LML's mineral lessees. The interpretation proposed by Weyerhaeuser, that it has the right to require third parties to negotiate with Weyerhaeuser <u>for access</u> to the Property in connection with the exercise of LML's mineral rights, leads to unreasonable consequences or inequitable or absurd results. Without free right to access the Property in connection with its mineral exploration rights, LML's reservation of mineral rights in Article 6 of the Timber Contract is greatly diminished and potentially rendered meaningless.

14. Article 7 of the Timber Contract requires a set payment for each year that the surface of the Property <u>is utilized</u> in connection with the drilling or exploration

---

[72] PX 3 at 6, ¶ 7.
[73] PX 3-006-007, ¶ 7.

for subsurface minerals.[74] By using the yearly calculation method and specifically requiring that the valuation be based off of years "utilized", the Timber Contract intended for loss of use damages to be made in annual installments.

### (ii) "Non-Mineral Related" Agreements

15. The Timber Contract does not reserve to LML any right to use the Property for any purpose other than what is necessary or convenient for the exploration for or production of minerals <u>from the Property or land unitized therewith</u>. It does not reserve to LML the right to use the Property to construct pipelines to transport substances produced from locations <u>other than</u> the Property or land unitized therewith.

16. The Timber Contract grants Weyerhaeuser the right to use the surface of the Property "for any purpose it desires" subject only to LML's express reservation of rights.[75] The Timber Contract, specifically Articles 4, 5, and 18 of the Timber Contract, expressly authorize Weyerhaeuser to sublease or assign its rights.[76]

17. Interpreted "in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties,"[77] the Timber Contract

---

[74] PX 3 at 6-7, ¶ 7(L) ("[F]or surface acres used in any manner relating to drilling or subsurface exploration if the surface is utilized for a period shorter or less than one (1) year; if the time the surface is used or utilized by Grantee exceeds one (1) year, then to pay an additional $60 for each year or part thereof for each surface acre utilized for any purpose in connection with the drilling or exploration for subsurface minerals"); *see IP Timberlands* 657 So.2d at 300.

[75] PX 3 at 5, ¶ 5.

[76] PX 3 at 4–5, 10 ¶¶4-5, 18.

[77] La. Civ. Code art. 2053.

permits Weyerhaeuser to enter into third-party agreements with respect to activities that do not fall within LML's reservation of rights.

18.  Accordingly, the Timber Contract does not restrict Weyerhaeuser from entering into surface use agreements for pipelines that carry minerals or other substances across the Property but do not produce LML's minerals.

### C. Breach

19.  The Court finds that the amounts received by Weyerhaeuser were in excess of that permitted under the Timber Contract and Weyerhaeuser's use of surface use agreements to effect pre-payment of damages violated the terms of the Timber Contract.

20.  At least some of Weyerhaeuser's agreements with third parties do not infringe on LML's mineral rights because they do not relate to the exploration for or production of minerals from the Property or land unitized therewith.

### D. Damages

21.  There is no evidence that Weyerhaeuser's excessive charges or pre-payment of damages prevented LML from concluding an oil and gas lease with a third party or caused LML to lose any business opportunity. LML's witnesses acknowledged that they are unable to identify any lost business, including lost opportunities or compensation, as the result of any actions by Weyerhaeuser.

22.  LML has not connected any Weyerhaeuser agreement it seeks damages for to a specific LML oil and gas lease and many of the Weyerhaeuser agreements

listed in LML's Petition are for transmission pipelines unrelated to the minerals subject to the Timber Contract.[78]

23.    LML has produced no evidence that it attempted to obtain from the third parties the amounts paid to Weyerhaeuser. The evidence showed that, prior to this litigation, LML did not seek to be paid for surface access beyond any payments it received under its standard oil and gas leases.[79]

## II.    Declaratory Judgment

1.    In a "case of actual controversy," the Declaratory Judgment Act permits the declaration of "rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."[80] "When considering a declaratory judgment action, a district court must engage in a three-step inquiry."[81] The court must ask (1) "whether an 'actual controversy' exists between the parties" in the case; (2) whether it has authority to grant declaratory relief; and (3) whether "to exercise its broad discretion to decide or dismiss a declaratory judgment action."[82]

2.    To show an actual controversy, the dispute at issue "must be definite and concrete, real and substantial, and admit of specific relief through a decree of a conclusive character."[83] Although "[d]eclaratory judgments cannot be used to seek an opinion advising what the law would be on a hypothetical set of facts

---

[78] DX 39; DX 58.
[79] DX 509; DX 579; DX 725; DX 500; DX 550; DX 642.
[80] 28 U.S.C. § 2201(a).
[81] *Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 294 (5th Cir. 2019) (citing *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000)).
[82] *Id.* (citing *Orix Credit All., Inc.*, 212 F.3d at 895).
[83] *Id.* (citing *Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir. 2009)).

..., declaratory judgment plaintiffs need not actually expose themselves to liability before bringing suit."[84] "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[85]

3.  Relying on *Payne v. Wells Fargo Bank Nat'l Ass'n*, Weyerhaeuser contends that LML is not entitled to declaratory judgment because LML cannot establish an underlying cause of action.[86] However, the rule in *Payne* was developed from a line of cases that actually stood for the proposition that declaratory judgment cannot provide relief unless there is a justiciable controversy between the parties.[87]

4.  Here, a substantial controversy exists between the parties as to their respective rights under the Timber Contract and there is sufficient immediacy to warrant a declaratory judgment because the parties' relationship is ongoing.

5.  Accordingly, the Court holds that:

    a.  LML has the sole right to enter into agreements necessary and incidental to the exploration for and production of any and all minerals originating from the Property.

    b.  As it concerns LML's Property, Weyerhaeuser may only contract with LML's mineral lessees to obtain compensation for damages in

---

[84] *Id.* (citing *Vantage Trailers, Inc.*, 567 F.3d at 748).

[85] *Id.* (citing *MedImmune*, 549 U.S. at 127 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941))).

[86] *Payne v. Wells Fargo Bank Nat'l Ass'n*, 637 F. App'x. 833, 838 (5th Cir. 2016) ("[D]eclaratory judgment is dependent on the assertion of viable causes of action.")).

[87] *Id.* (quoting *Stallings v. CitiMortgage, Inc.*, 611 Fed.Appx. 215, 217–18 (5th Cir.2015) (citing *Williams v. Wells Fargo Bank, N.A.*, 560 Fed. Appx. 233, 243 (5th Cir. 2014)) (citing *Sgroe v. Wells Fargo Bank, N.A.*, 941 F.Supp.2d 731, 752 (E.D.Tex.2013))).

accordance with Article 7.

c. Pursuant to the Timber Contract, Weyerhaeuser's remedies with respect to LML's exercise of its rights are limited to those expressly included in Article 7 thereof.

d. Weyerhaeuser may not negotiate additional fees for LML's mineral lessees to access the Property; although LML's mineral lessees must give Weyerhaeuser notice of their operations in accordance with Article 7(C).

e. Article 7 dictates that Weyerhaeuser is only entitled to compensation for the fair market value of timber and loss of use calculated at $60 per acre adjusted for inflation.

f. The Timber Contract contemplates an annual payment of these damages.

g. Weyerhaeuser is permitted to sublease the surface of the Property for any purpose it desires, except for agreements necessary for and incidental to the exploration and production of minerals originating from the Property.

h. The Timber Contract does not restrict Weyerhaeuser from entering into surface use agreements for pipelines that carry minerals or other substances across the Property but do not produce LML's minerals.

## FEES AND COSTS

The Timber Contract authorizes recovery of fees and costs to the prevailing party. Here, LML obtained declaratory relief but failed on its damages claim. Weyerhaeuser avoided monetary liability but was found to have violated the terms of the Timber Contract. Having found that neither party is the "prevailing" party in this action, the Court holds that neither party is entitled to attorneys' fees under Article 21 of the Timber Contract.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Louisiana Minerals, Ltd.'s breach of contract claim is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Louisiana Minerals, Ltd.'s request for declaratory judgment is **GRANTED IN PART** as set forth above.

**IT IS FURTHER ORDERED** that Louisiana Minerals, Ltd.'s and Weyerhaeuser Company's requests for attorneys' fees and costs are **DENIED**.

**THUS DONE AND SIGNED** this 31st day of March 2026.

**JERRY EDWARDS, JR.**
**UNITED STATES DISTRICT JUDGE**